UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

HICKORY GROVE, LLC,                    )
                                       )
                                       )
            *Plaintiff,*               )
                                       )       No. 1:10-CV-290
      v.                               )
                                       )       Chief Judge Curtis L. Collier
RACK ROOM SHOES, INC.,                 )
                                       )
                                       )
            *Defendant.*               )

## MEMORANDUM

The Court held a bench trial that lasted three days between March 26 and March 28, 2012. Plaintiff Hickory Grove, LLC ("Plaintiff") is the current owner and landlord of the Hickory Grove Shopping Center ("Shopping Center") located in Cleveland, Tennessee. Defendant Rack Room Shoes, Inc. ("Defendant") is a current tenant at the Shopping Center. The case concerned a dispute between Plaintiff and Defendant regarding the Lease Agreement and the proper amount of rent.

On September 23, 2010, Plaintiff filed its complaint before the Chancery Court for Bradley County, Tennessee (Court File No. 1-1). The case was removed to the United States District Court for the Eastern District of Tennessee on October 25, 2010. In its complaint, Plaintiff seeks a judgment that the Lease Agreement has been amended in accordance with the various emails sent between the parties and that Defendant is required to perform under the amended Lease Agreement (*id.*). Plaintiff also seeks recovery of all damages incurred due to Defendant's failure to honor its obligations in light of the emails.

The Court heard the testimony of four witnesses: (1) Howard Zoldessy, a broker with Southern Management and Development, L.P., who testified on behalf of Plaintiff, (2) R. Keith

Thompson, Plaintiff's expert witness, (3) Mark Montagna, Defendant's expert witness, and (4) Margie Lee, Defendant's real estate manager for the area that includes the Cleveland store, who testified on behalf of Defendant. The Court also received a large number of exhibits. Pursuant to Fed. R. Civ. P. 52(a)(1), the Court now issues its findings of fact and conclusions of law, which explain why the Court will enter judgment for Defendant.

## I.     FINDINGS OF FACT

1.     Plaintiff, Hickory Grove LLC, is the owner of the Hickory Grove Shopping Center in Cleveland, Tennessee (the "Shopping Center").

2.     Defendant, Rack Room Shoes, Inc., is a tenant at the Shopping Center.

3.     This Court has jurisdiction of this litigation pursuant to 28 U.S.C. § 1332 based upon complete diversity of citizenship and the amount in controversy exceeding $75,000.

4.     Venue lies in the United States District Court for the Eastern District of Tennessee, Southern Division.

5.     Plaintiff, through its predecessor-in-interest, Fairfield Development, and Defendant are parties to a Lease Agreement (Pl.'s Ex. 1, Def.'s Ex. 1) originally dated August 5, 1999, and as amended and extended thereafter. At the time Defendant entered into the Lease Agreement, the occupants of the Shopping Center included several large tenants, including, but not limited to, a book store named Books-A-Million and a department store named Goody's Family Clothing ("Goody's"). Under the Lease Agreement, Goody's is identified as a "Key Tenant." The Lease Agreement, in pertinent part, provides the following:

2

<u>Section 1.06 Key Tenants</u>. As a material inducement causing Tenant to enter into this Lease, Landlord covenants that it has entered into agreements with certain key tenants, together with any replacement tenants thereof, (the "Key Tenants") . . .

. . .

Tenant agrees that, for purposes of this Section 1.06, Section 1.07 and Section 2.03, Landlord may substitute the "Goody's Family Clothing Qualified Replacement" . . . in which case each such replacement tenant shall be deemed a "Key Tenant" in substitution of the Key Tenant which it replaces. For purposes of this Lease, the "Goody's Family Clothing Qualified Replacement" . . . shall mean tenants which are substantially similar to Goody's Family Clothing . . . in each of the following respects: (i) quality, type and mix of merchandise carried; (ii) price points of merchandise carried; (iii) type of customer; and (iv) number of stores. Tenant agrees, for purposes of this Section 1.06, that acceptable qualified replacement tenants include the following named stores: Nieman Marcus Rack; Nordstrom Rack; Marshall's; Palais Royal; Steinmart; Upton's; Stage; Old Navy; Ross Dress for Less; and Kohl's Department Store.

<u>Section 1.07 Absence of Key Tenant</u>. During the primary and any extended term of this Lease (a) in the event of cancellation or other prior termination of either Key Tenant Agreement referred to above; or (b) if either Key Tenant ceases to operate its business for the use identified in Section 1.06[;] or (c) if any Key Tenant space as identified in Section 1.06 becomes substantially vacant for a period of thirty (30) consecutive days or longer; or (d) if any two (2) "Anchor Tenants" located within the Shopping Center cease the operation of business from their respective premises; or (e) if greater than twenty-five (25%) percent of the "non-Anchor Tenant" floor area within the Shopping Center ceases to be used for the operation of business or if such space becomes continuously vacant for a period of thirty (30) consecutive days or longer, then in any such event Guaranteed Minimum Rent and all other amounts otherwise payable under this Lease shall be abated during the continuance of any such condition and Tenant shall pay to Landlord monthly, in arrears, a sum equal to the lesser of four percent (4%) of Gross Sales, or Guaranteed Minimum Rent only, during the continuance of such condition, and, should any such condition continue for a period of twelve (12) months, then at any time after the expiration of such twelve (12) month period, Tenant, at its option, may terminate this Lease and be relieved of any further obligation to Landlord upon thirty (30) days'

3

written notice of its election to terminate.

The Lease Agreement also provides:

Section 20.15 Entire Agreement; Amendment. As of the execution hereof, this Lease contains all covenants and agreements between Landlord and Tenant exclusively relating in any manner to the rental, use and occupancy of the Premises and the other matters set forth in this Lease. No prior agreement or understanding pertaining to the same shall be valid or of any force or effect, and the covenants and agreements of this Lease cannot be altered, changed, modified, or added to, except in writing signed by Landlord and Tenant.

This Lease is the result of the joint efforts and negotiations of the parties hereto, with each party being represented, or having the opportunity to be represented, by legal counsel of its own choice, and no singular party is the author or drafter of the provisions hereof. Each of the parties assumes joint responsibility for the form and composition of each and all of the contents of this Lease and each party agrees that this Lease shall be interpreted as though each of the parties participated equally in the composition of this Lease and each and every provision and part hereof. The parties agree that the rule of judicial interpretation to the effect that any ambiguity or uncertainty contained in an agreement is to be construed against the party who drafted the agreement shall not be applied in the event of any disagreement or dispute arising out of this Lease.

Section 20.06 of the Lease Agreement provides for the recovery of attorney's fees and expenses by the prevailing party in this action.

6. The initial term of the Lease was for five years, and Defendant had three option periods of five years each that it could exercise, should it wish to do so. On November 24, 2004, the Lease was extended and modified by a written Lease Modification and Extension agreement (Pl.'s Ex. 2).

7. Plaintiff acquired the Shopping Center in June 2007 subject to all existing leases.

4

8.      Southern Management and Development, L.P. ("SMD") provided management, maintenance, and leasing to Plaintiff (Pl.'s Ex. 3). Howard Zoldessy, a broker for SMD, was responsible for leasing matters regarding the Shopping Center.

9.      On or around May 14, 2008, a non-anchor store, Books-A-Million, vacated its space at the Shopping Center, which caused more than 25% of the "non-Anchor Tenant" floor area within the Shopping Center to be vacant (the "Books-A-Million Vacancy"). This condition continued for a period of thirty consecutive days or longer, and in June 2008, Defendant, pursuant to Section 1.07 of the Lease Agreement, began remitting 4% of its gross sales as rent in lieu of the Guaranteed Minimum Rent and all other charges under the Lease (Pl.'s Ex. 4).

10.     On July 29, 2009, Ernie Shore, Defendant's Chief Financial Officer, on behalf of Defendant exercised Defendant's right to extend the Lease from November 30, 2009 until November 30, 2014, without waiving Defendant's right to pay reduced rent due to the co-tenancy issue (Pl.'s Ex. 5).

11.     On or around February 27, 2009, Goody's vacated its space at the Shopping Center. The space formerly occupied by Goody's was eventually leased to Chattanooga Goodwill Industries, Inc. ("Goodwill"). In September 2010, Aldi Foods began operating in the Shopping Center, which cured the Books-A-Million vacancy.

12.     Goody's filed for bankruptcy and was subsequently liquidated. Due to its liquidation, it closed all of its stores including the Cleveland store.

13.     Because of the departure of Goody's, Mr. Zoldessy on behalf of Plaintiff pursued other businesses to occupy the space vacated by Goody's (Pl.'s Ex. 8, Def.'s Ex. 5).

5

He testified he contacted twenty, thirty, or perhaps forty businesses. The entities Mr. Zoldessy contacted about replacing Goody's included, but is not limited to, Stage Stores, Best Buy, HH Gregg, Office Max, Publix, Regency Centers (aka Stein Mart), Belk, Bass Pro Shops, Orvis, and Fresh Market (Def.'s Ex. 5). None of these potential Goody's replacements sold used items. Mr. Zoldessy expressed that, because of the economy, he might have offered rent reductions to the prospective businesses but nothing drastic.

14. Goodwill is a not-for-profit entity that accepts donations of used items for resale to the public, commonly called a thrift store.

15. According to Mr. Zoldessy, Goodwill expressed an interest in renting the vacant space. Goodwill informed Mr. Zoldessy it wanted to have a more upscale store with an upgraded profile. As such, it wanted a nicer, neater, and cleaner store environment.

16. Mr. Zoldessy testified he thought Goodwill was compatible as a tenant at the Shopping Center and did not think it would change the character of the Shopping Center. He testified that he believed Goodwill would enhance the Shopping Center.

17. From emails at the time, Mr. Zoldessy did have some concerns about Goodwill leasing the space and the possible adverse effect this might have on existing tenants (*see* Def.'s Ex. 15). Mr. Zoldessy wanted Plaintiff to be aware of the "fallout" of renting to Goodwill, that being Defendant's ability to pay 4% of its gross sales as rent in lieu of Guaranteed Minimum Rent and other charges under the Lease Agreement (*id.*). He does not recall discussing the possibility of Goodwill leasing

6

the vacant space with Defendant.

18. On July 23, 2009, Mr. Zoldessy sent Margie W. Lee, the real estate manager for Defendant, an email stating that he looked forward to having a conversation with her regarding the Lease and rent reduction (Pl.'s Ex. 9). The email stated in part "Whether you stay or leave I wish you the best of luck; however, if you stay the LL will work with you on a rent reduction . . . ." (*id.*).

19. Beginning in March 2010, Mr. Zoldessy and Ms. Lee exchanged several emails in an effort to negotiate a modification of the Lease Agreement (Pl.'s Exs. 14-26; D.'s Exs. 6-10).

20. By email dated March 16, 2010, Ms. Lee responded to a prior proposal of Mr. Zoldessy. In her email she stated there were two issues that had to be addressed for Defendant's Executive Committee to approve the return to a fixed monthly rent. The proposed $10 per square foot fixed rent would have to be a Gross Rent. Also, there would need to be a sales volume provision that allowed for payment of a percentage of gross sales if those sales fell below $850,000 (Pl.'s Ex. 14).

21. A series of email's flowed back and forth between Ms. Lee and Mr. Zoldessy thereafter. In these emails Mr. Zoldessy inquired whether the $850,000 sales threshold and 6% rent would apply during the option period of December 2014 through November 2019 and whether Defendant would waive its right to terminate the Lease based on the co-tenancy violation and would modify the co-tenancy language to "include a cure" (Pl.'s Ex. 16). Ms. Lee responded to Mr. Zoldessy's questions in the following manner: "If we reach agreement on the terms of my

7

proposal below dated March 16, we would consider the current co-tenancy violation cured once Aldi opens. This waiver is applicable to the Goodwill as a replacement tenant and the current vacancy of the former Books A Million and the former Pier One stores. . . . Future co-tenancy violations other than those above that may occur would have the same Tenant remedies and rights as are currently in the Lease, no language would change" (*id.*).

22.     In an email to Ms. Lee, Mr. Zoldessy on March 18 wrote: "The Landlord has asked me to present the following terms and conditions: When Aldi opens your base rent would be $10 psf plus pass-throughs; pass-throughs are currently $2.16 psf and they would be capped at $2.16 for the balance of the term, which expires 11/30/14. During the term if sales fall below $800,000 rent would be 4% of gross sales in lieu of $10 plus pass-throughs. The base rent for the additional option 12/1/14 to 11/30/19 would be $13 psf plus pass-throughs; operating expenses would be capped, RE Taxes and Ins would be pro rata. If sales fall below $800,000 rent would be 4% of gross sales in lieu of $13 plus pass-throughs. The co-tenancy clause would be amended. Current co-tenancy would be cured by virtue of Aldi and Goodwill leases. Co-tenancy could again be invoked under the conditions that resulted in current co-tenancy and Landlord could cure that co-tenancy with new tenants" (Pl.'s Ex. 17).

23.     On March 19, 2010, Ms. Lee responded to Mr. Zoldessy's email. She stated she was providing answers to his counterproposal and that her responses indicated "the best deal the committee will consider as an alternative to closing" (Pl.'s Ex. 17). Among other things, she answers that the fixed rent would be $10 psf gross and, if sales fall

8

below $850,000, Defendant would pay 4% of gross sales in lieu of fixed rent. With respect to the Proposed Modification Option period, Ms. Lee states that "If sales fall below $800,000 rent would be 4% of gross sales in lieu of all charges" (*id.*).

24.     On April 16, 2010, Mr. Zoldessy sent another proposal to Ms. Lee regarding the proposed modification to the Lease and the Proposed Modification Option. In this email Mr. Zoldessy proposed rent would be $11.00 gross when Aldi opens through November 30, 2014 and if sales fall below $800,000 rent would be 3%. For the option period of December 1, 2014 through November 30, 2019, rent would be $14.00 NNN. If sales fall below $800,000 rent would be 3% NNN (Pl.'s Ex. 18).

25.     On April 19, 2010, Ms. Lee responded to Mr. Zoldessy's proposal, with Mr. Zoldessy's proposal being in regular font and her comments being noted in red below:

> Margie,
>
> The LL and lender understand your request to reduce your occupancy cost and although the lender is exerting a great deal of pressure they both will approve a rent reduction. I hope you find these terms to be a reasonable compromise for all parties.
> When Aldi opens through Nov 30, 2014 rent would be $11.00 gross OK. If sales fall below $800,000 (no, must be $850,000) rent is 3% (4% in lieu of all charges) NNN.
> Option period Dec 1, 2014 through Nov 30, 2019 rent would be $14.00 NNN (OK if cap on all extra charges $1.50psf). If sales fall below $800,000 (OK) rent is 3% NNN (in lieu of all charges).

(Pl.'s Ex. 18). The "psf" term and the "$800,000" term are two separate terms of the Proposed Modification Option.

26.     Thereafter, on April 19, 2010, Mr. Zoldessy and Ms. Lee exchanged emails related

9

to the "psf" term of the Proposed Modification Option, with Ms. Lee admitting that she made a mistake and that the "psf" term should be $2.16psf, rather than the $1.50psf noted in her previous email (quoted above). However, these emails related to the "psf" term do not mention the previously agreed upon "$800,000" sales volume term for the Proposed Modification Option (Pl.'s Ex. 19).

27.    On April 21, 2010, Mr. Zoldessy emailed Ms. Lee with yet another proposal from Plaintiff. That same day, Ms. Lee responded that the terms set forth in Mr. Zoldessy's email of April 21, 2010 were not acceptable and that the terms outlined in the "couple of emails from me dated April 19, is the bottom line." The April 19 emails referenced by Ms. Lee included a "$800,000" sales volume term with respect to the Proposed Modification Option. Ms. Lee stated that "we will not concede anything further. I have no idea who these owners are, but it's over" (Pl.'s Ex. 19).

28.    On April 27, 2010, Mr. Zoldessy sent to Ms. Lee an email accepting Ms. Lee's previous proposal for an amendment to the Lease. Mr. Zoldessy emailed Ms. Lee and stated that "LL and lender have agreed to accept your terms . . . . If you're OK with this let's get it drafted." However, Mr. Zoldessy's email of April 27, 2010 does not contain the "$800,000" sales volume term related to the Proposed Modification Option, as previously agreed to (Pl.'s Ex. 20).

29.    Ms. Lee responded to this email on April 28, 2010, writing: "I will prepare the final package necessary for our executive committee to approve at the next meeting. I will have to check the date for that, but it will be the week of May 3 or May 10. I do not anticipate a problem with approval but will let you know when it is official" (Pl.'s

Ex. 20).

30. On April 28, 2010, Ms. Lee submitted the terms of the proposed modification to Defendant's Executive Committee (Real Estate Committee). In that proposal, Ms. Lee noted the terms upon which the modification was being sought, including the "800,000" sales volume term in the Proposed Modification Option:

> The existing option (12/1/14 – 11/30/19) would also be changed to $14.00 psf plus flat extras of $2.16 psf with the downside protection that should sales in ANY 12 month period fall below $800,000, we would only be required to pay 4% of gross sales in lieu of all charges.

(Def.'s Ex. 22).

31. This proposal contained provisions regarding a sales volume cap for the extension period because Ms. Lee understood Mr. Zoldessy had agreed to this provision.

32. The Executive Committee approved the proposal presented by Ms. Lee.

33. By an email dated May 11, 2010, Ms. Lee informed Mr. Zoldessy that "As of this morning, the lease modification you and I worked out has received final approval. It will be assigned to one of our in-house attorneys today and a draft of the amendment should be ready to send to you by the end next week. Please verify that the document will be handled through yourself, but if not, please send me the name and contact info of your attorney" (Pl.'s Ex. 21).

34. That same day, Mr. Zoldessy responded to Ms. Lee's email stating that "Beverly Richards in our Boca office is our lease administrator and she coordinates document review, so I defer to her." Ms. Lee then responded stating "Does that mean our attorney should send the draft document to Beverly and not to you for any questions

11

or tweaking?" Beverly Richards, who was copied on these various emails, then responded "I'll provide the document to the landlord for his review" (Def.'s Ex. 8).

35. After the Executive Committee approved the proposal presented by Ms. Lee, the legal department of Defendant reviewed the proposal.

36. The Legal Department objected to the proposal and ultimately top management at Defendant decided to not approve the proposal.

37. Ms. Lee relayed Defendant's decision to Mr. Zoldessy in an email dated June 9, 2010. In that email she related: "There is a problem getting the amendment done. When our general counsel saw the paperwork for the amended deal, he advised senior management that his interpretation of the co-tenancy violation in the lease indicates we can stay on reduced percentage of sales and not return to any fixed rent. He is basing that on the qualified replacement tenant language in the lease not being met primarily with Goodwill instead of Goody's. I am hopeful we can still resolve this on our end" (Pl.'s Ex. 22).

38. On June 30, 2010, Ms. Lee emailed Mr. Zoldessy and informed him that her senior vice president had just told her the decision had been made and that they would be remaining in the location under the existing Lease terms. That meant they would not agree to a modification (Pl.'s Ex. 24).

39. On July 1, 2010, Mr. Zoldessy sent Ms. Lee an email expressing his disappointment that Defendant had reversed its position so completely and that, if necessary, Plaintiff would go to court to enforce the email Lease amendment (Pl.'s Ex. 25).

40. Thereafter, the parties continued to negotiate, with Defendant submitting another

12

proposal on July 8, 2010, which Plaintiff rejected (Pl.'s Ex. 25).

41. On June 30, 2010, Richard Nantz, Associate General Counsel of Defendant (the letter bears a mistaken date of July 30, 2009), sent a letter by FedEx overnight delivery to Plaintiff informing Plaintiff that, even if Aldi opened in the Shopping Center, Defendant would still consider Plaintiff in violation of the Lease with respect to the co-tenancy provision because Defendant did not consider Goodwill a qualified replacement for Goody's. Mr. Nantz expressed Defendant's intent to pay reduced rent because of the co-tenancy failure (Pl.'s Ex. 6).

42. On August 10, 2010, Mr. Zoldessy emailed Ms. Lee an offer which proposed that Defendant vacate the Shopping Center by Christmas, stating "We shake hands and move on." On August 13, 2010, Ms. Lee responded "We are not interested in leaving the market or the center. Therefore, we will not accept your proposal below" (Pl.'s Ex. 26).

43. Aldi's opened its store in the Shopping Center on September 9, 2010, which cured the Books-A-Million vacancy.

44. Expert testimony was offered at trial with regard to whether Goodwill meets the requirements of a "Goody's Family Clothing Qualified Replacement" under the terms of the Lease Agreement. Section 1.06 requires that the "Goody's Family Clothing Qualified Replacement" be substantially similar to Goody's in all of the following respects: (i) quality, type and mix of merchandise carried; (ii) price points of merchandise carried; (iii) type of customer; and (iv) number of stores.

45. Plaintiff's expert, R. Keith Thompson, testified that Goodwill is a "discount retailer"

selling a wide variety of goods and admitted that a "large portion" of Goodwill's goods are "gently used items." Mr. Thompson also testified that Goodwill's price points were similar to Goody's, relying solely upon Goody's 2000 Annual 10K Report, which stated that Goody's "pricing strategy is designed to provide value to its customers by offering merchandise at value prices generally below the prices of traditional department and specialty stores." Mr. Thompson also testified that the type of customer at the Goodwill thrift store is comparable to that at Goody's and that Goodwill operates more stores than does Goody's.

46.    Defendant's expert witness, Mark Montagna, visited a Goody's location in Murfreesboro, Tennessee on April 16, 2011. He also visited the Goodwill thrift store at the Shopping Center on May 22, 2011. Mr. Montagna testified that the quality and type of merchandise carried by the Goodwill thrift store was substantially different than Goody's. All of the Goodwill merchandise is previously worn apparel or previously used home related products. By contrast, Goody's sells new, first quality, defect free merchandise. During his visit to the Goodwill thrift store at the Shopping Center, Mr. Montagna did not see any new merchandise. While noting some similarities between the product mix carried by Goodwill and Goody's, Mr. Montagna testified that Goodwill's product mix is all used items, while Goody's product mix is all new items. Additionally, Mr. Montagna noted that Goodwill does not have the breadth of merchandise that Goody's maintains. Mr. Montagna estimated that 90% of Goodwill's sales came from the sale of used clothing items and the remaining 10% came from the sale of used household items. By contrast,

82% of Goody's sales came from the sale of new apparel with its remaining sales coming from the sale of new household goods.

47.     Mr. Montagna also testified that the price points of the Goodwill thrift store are not substantially similar to that of Goody's. Mr. Montagna testified that Goodwill's price points are 80-99% below the prices of Goody's. He examined the prices of various items he noted during his visits to the Goody's store in Murfreesboro and the Goodwill thrift store at the Shopping Center. Goodwill's prices ranged from $0.99 to $7.99, with the one exception of a woman's two-piece suit being priced at $12.99. On the day he visited the Goodwill thrift store at the Shopping Center it was running a 50% off sale, meaning that the items would be reduced to half of the previously identified prices. On his visit to the Goody's location in Murfreesboro, Tennessee, Mr. Montagna noted a price range of $9.00 to $129.00. As specific examples, Mr. Montagna noted that women's dresses were being sold at Goody's for between $54.00 and $128.00, while at Goodwill women's dresses were being sold for $7.99; at Goody's women's jeans were being sold for between $20.00 and $50.00, while at Goodwill women's denim was being sold for $7.49; at Goody's women's shirts and blouses were being sold between $28.00 and $69.00, while at Goodwill women's shirts and blouses were being sold for $4.29; and at Goody's men's sportshirts had a price point of $26.00 to $58.00, while at Goodwill men's shirts were being sold for $4.99 and $7.99.

48.     Mr. Montagna also testified that the type of customer attracted by Goodwill is not substantially similar to the customer attracted by Goody's. He based this conclusion

15

upon the price differentials between the merchandise carried by Goodwill as compared to Goody's. His conclusion was that the Goody's customer is willing to spend 5 to 20 times the amount on new merchandise carried by Goody's than the Goodwill customer is willing to spend on used items at Goodwill. Mr. Montagna did not dispute the fact that Goodwill has more stores than Goody's overall.

49.    Section 20.15 of the Lease provided that changes and amendments to the Lease would have to be in writing and signed by both parties.

50.    In August 1999, the Lease was modified by a letter from Jack R. Crumpacker, Corporate Counsel for Defendant and signed by Margot Everhart and Anne Stafford for Fairfield Development (Def.'s Ex. 2).

51.    In November 1999 and February 2002 the Lease was modified twice more in a similar fashion (Def.'s Exs. 3, 4).

## II.    CONCLUSIONS OF LAW

1.    The Court must first determine whether the email communications between Mr. Zoldessy and Ms. Lee constituted a valid, enforceable agreement to modify the Lease.  A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)).  To determine mutuality of assent, a court "must apply an

objective standard based upon the parties' manifestations." *Id.* (quoting *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002)).

"The parties' actions or inactions, as well as spoken words, can establish mutual assent." *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) (citation omitted). Moreover, "a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested." *Cummins v. Opryland Productions*, 2001 WL 219696, at *2 (Tenn. Ct. App. 2001) (citing *Canton Cotton Mills v. Bowman Overall Co.*, 257 S.W. 398, 402 (Tenn. 1924)).

2. "The cardinal rule in the construction of contracts is to ascertain the intent of the parties. If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made." *Pitt v. Tyree Org., Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citations and internal quotation marks omitted).

3. Here, even assuming Mr. Zoldessy and Ms. Lee had the authority to enter into a

Lease modification, there was no "meeting of the minds." An April 19 email from Ms. Lee to Mr. Zoldessy discussed the inclusion of a sales volume term for the Proposed Modification Option. Even after subsequent counterproposals from Mr. Zoldessy, Ms. Lee reiterated in her April 21 email that her April 19 emails, which included the sales volume term, was the "bottom line." Hence, Ms. Lee's email was an offer that Defendant could either accept or reject. Although Mr. Zoldessy stated in his April 27 email to Ms. Lee that the landlord and lender had agreed to accept her terms, his email failed to mention the $800,000 sales volume term. By proposing to accept an offer that varied from the terms of the original offer, Mr. Zoldessy had not accepted Ms. Lee's offer. Hence, the parties had not reached a final agreement on the terms of the Lease modification.

4.      As further proof that "mutual assent" was lacking, Ms. Lee testified that she continued to believe the sales volume term was part of the modification agreement even after receiving Mr. Zoldessy's April 27 email. In fact, Ms. Lee included the $800,000 sales volume term in the modification package that she presented to the Executive Committee. That package was subsequently approved by the Executive Committee. Both Ms. Lee's statements and her actions reveal that there was not mutuality of assent.

5.      Plaintiff also failed to demonstrate that the email communications between Mr. Zoldessy and Ms. Lee constituted a final, written document signed by the parties. Among other things, Section 20.15 of the Lease requires that any changes to the Lease must be in writing and signed by the Landlord and Tenant.

6.   At the outset, Plaintiff has not shown both Mr. Zoldessy and Ms. Lee had authority to draft and sign a final and binding Lease modification. An agent's actual authority "consists of powers which the principal directly confers upon the agent or causes the agent to believe he possesses." *Raspberry v. Campbell*, No. W2006-01668-COA-R3-CV, 2007 WL 2471512, at *5 (Tenn. Ct. App. 2007) (citing *Hollingshead Co. v. Baker*, 1926 WL 2125, at *4 (Tenn. Ct. App. Dec. 7, 1926)). "The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Mechs. Laundry Serv. v. Auto Glass Co. of Memphis, Inc.*, 98 S.W.3d 151, 157 (Tenn. Ct. App. 2002) (quoting *S. R. Co. v. Pickle*, 197 S.W. 675, 675 (Tenn. 1834)).

7.   Mr. Zoldessy testified he had authority to engage in negotiations and finalize rent modification agreements. Ms. Lee, on the other hand, testified she did not have authority to finalize a modification agreement. Her role was limited to participating in the negotiation process and preparing the package for the Executive Committee to approve. She explained that she had told Mr. Zoldessy that Defendant's legal team was responsible for drafting the final documents and that an officer of the company must sign them. Hence, Ms. Lee did not have actual authority to enter into an enforceable agreement on behalf of Defendant nor does it appear Defendant ever held Ms. Lee out as having such authority. In the absence of either actual or apparent

authority on the part of Ms. Lee, Mr. Zoldessy and Ms. Lee could not have entered into a final, written agreement on behalf of the parties.

8.   As additional proof that the email communications did not constitute a final, written agreement, the Court notes that Defendant offered evidence of past Lease modifications in which the original parties to the Lease--that is, Fairfield Development and Defendant--agreed to modifications by drafting letters and those letters were personally signed by officers of both companies.

9.   Viewing the evidence in the record as a whole, Plaintiff has not shown by a preponderance of the evidence that Plaintiff and Defendant entered into a valid, enforceable Lease modification agreement.

10.  In concluding there is no valid, enforceable Lease modification, the Court must now determine whether Goodwill is a "Goody's Family Clothing Qualified Replacement" under the terms of the Lease Agreement.  As noted earlier, to demonstrate that a store is a proper replacement for Goody's, Plaintiff must show that the replacement store is substantially similar in the following ways: (i) quality, type and mix of merchandise carried; (ii) price points of merchandise carried; (iii) type of customer; and (iv) number of stores.

11.  Plaintiff has failed to demonstrate that Goodwill is a proper replacement for Goody's.  First, Goodwill sells primarily "gently used" items whereas Goody's sells new, defect free merchandise. Goody's also has a greater mix of clothes and household items than Goodwill.  Second, the price range at the two stores are substantially different.  According to Mr. Montagna, Goodwill's price points were

80-99% below the prices of Goody's. Third, the type of customer at Goodwill is substantially different from the customer at Goody's. Mr. Montagna testified that a Goody's customer would be willing to pay 5 to 20 times the amount on new merchandise compared to what a Goodwill customer would be willing to spend on items at Goodwill. Finally, with respect to the number of stores, Goodwill has always had more stores than Goody's.

12.     At trial, Plaintiff raised additional arguments to support its claim that Goodwill is a proper replacement for Goody's. Plaintiff noted the Shopping Center contained a store named Children's Orchard, which also sold used clothing. As noted by Defendant, however, Children's Orchard is an improper comparison to Goodwill because Children's Orchard is not a "Key Tenant." Plaintiff also spent significant time discussing the physical appearance of Goodwill in support of its argument that Goodwill was a proper replacement. Yet the physical appearance of a Goody's replacement store is not one of the Section 1.06 factors.

13.     Considering the record as a whole, Plaintiff has not demonstrated by a preponderance of the evidence that Goodwill is a proper replacement for Goody's pursuant to Section 1.06 of the Lease Agreement.

14.     A final argument raised by Plaintiff is that the Court should declare the co-tenancy provision of the Lease unenforceable because Defendant's use of the provision is punitive in nature and bears no reasonable relationship to actual damages suffered by Defendant. In support of its argument, Plaintiff offered evidence that Defendant experienced an increase in sales when Goodwill replaced Goody's as a "Key

Tenant." The clear, unambiguous language of the Lease, however, describes the conditions that must be satisfied for a party to invoke the co-tenancy provision. Neither Section 1.06 nor 1.07 requires Defendant to show decreased sales in order to invoke the co-tenancy provision. Moreover, Plaintiff has not shown there was any evidence of fraud or undue mistake, nor that the provision is so unconscionable, to justify this Court not enforcing the contract as it is written.

15. Accordingly, Plaintiff has failed to demonstrate by a preponderance of the evidence that the email communications between Mr. Zoldessy and Ms. Lee constituted a valid and enforceable modification of the Lease. Plaintiff has also failed to demonstrate that Goodwill was a "Goody's Family Clothing Qualified Replacement." As the prevailing party, Defendant is entitled to recover attorney's fees and expenses incurred in defending this action pursuant to Section 20.06 of the Lease Agreement.


## III. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to carry its burden by a preponderance of the evidence and the Court accordingly enters judgment for Defendant.

An Order shall enter.

/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**